OPINION OF THE COURT
Thomas D. Buchanan, J.
By verified petition filed May 28, 2015, petitioner seeks an evidentiary hearing upon his requested annual review pursuant to Mental Hygiene Law § 10.09 to determine whether he remains a dangerous sex offender requiring confinement. Petitioner was civilly committed pursuant to article 10 of the Mental Hygiene Law on June 3, 2014.[1]
Petitioner was notified of his annual right to petition the court for discharge on April 13, 2015, and petitioner did not waive such right. An interview was conducted on May 4, 2015 by Danielle Tope, Psy.D., a licensed psychologist for the New York State Office of Mental Health (OMH). Petitioner was informed of his right to not participate in the interview for the evaluation and petitioner declined to participate. Dr. Tope conducted the remainder of her annual evaluation by reviewing petitioner’s records, including previous psychological evaluations conducted by OMH personnel, as well as petitioner’s selected psychiatric experts. In her evaluation report dated June 5, 2015, Dr. Tope opined that petitioner met the criteria for diagnoses of other specified paraphilic disorder, non-consent; antisocial personality disorder; and cannabis use disorder, in a controlled environment. In light of these diagnosed conditions, Dr. Tope further opined that petitioner “is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility” (Tope report at 17). On July 20, 2015, petitioner was provided with the Commissioner’s determination that petitioner was a dangerous sex offender requiring confinement.
Petitioner challenges the finding of Dr. Tope and has provided his own expert, Jeffrey Singer, Ph.D., who opines that petitioner does not have a mental abnormality. An evidentiary hearing *755 was held on October 19, 2015 at which both Dr. Tope and Dr. Singer testified. The court has considered the testimony of the experts as well as the exhibits presented. Posttrial written summations were also considered. Upon consent, this matter had been delayed pending further submissions of decisions rendered in other courts relating to matters discussed in this hearing, specifically whether the diagnosis of other specified paraphilic disorder, non-consent, which had been subjected to Frye hearings[2] in two other New York cases, had gained general acceptance in the relevant psychiatric community.
Findings of Fact
1. Petitioner is currently a 55-year-old male who has spent the majority of his life incarcerated or confined.
2. Petitioner’s criminal history dates back to 1977 when he was 16 years old and he was first criminally convicted of attempted rape in the first degree in full satisfaction of an indictment involving two separate sexual offenses involving the attempted rape of a 48-year-old female and the rape of a 15-year-old female which occurred approximately three weeks apart. Both offenses involved the use of a weapon and were committed in a wooded area near a commuter train station. Petitioner demanded the 15-year-old victim’s identification card and her address following the rape.
3. Following his conviction, petitioner was sentenced to a term of 10 years’ incarceration, of which he served approximately five years before being released to parole.
4. Within weeks of being released to parole, petitioner engaged in another series of sexual offenses including the rape of a 38-year-old female, the rape of a 17-year-old female and the attempted kidnapping of a third female. All three of these incidents involved the use of a weapon and all occurred near or at the same location as the offenses in 1977. Petitioner demanded the identification card and address of the 17-year-old victim following the rape.
5. Petitioner was convicted of rape in the first degree by forcible compulsion and sexual abuse in the first degree relative to the 17-year-old female, for which he was sentenced to 12V2 to 25 years of incarceration. Petitioner also pleaded guilty to *756 criminal possession of a weapon in the third degree in satisfaction of the charges relating to the attempted kidnapping.
6. A jury found that petitioner had a mental abnormality pursuant to Mental Hygiene Law § 10.07. Thereafter, by decision and order dated June 3, 2014, the Supreme Court, Richmond County, determined that petitioner was a dangerous sex offender requiring confinement pursuant to Mental Hygiene Law § 10.03 (e).
7. Dr. Tope testified that she found it clinically significant that petitioner’s criminal history showed a pattern of repetitive offenses, and further, “the fact that he began at such a very early age, persisted despite sanctions, and, in fact, while under supervision, the fact that he offended despite reporting access to consenting partners, all are very significant factors” (tr at 9, lines 4-8).
8. Dr. Tope opined that petitioner exhibits a number of markers consistent with the research on paraphilia, non-consent, inasmuch as “[h]e reoffended within a very short period of time, committed multiple offenses within a two-week period on both occasions” (tr at 10, line 25 through 11, lines 1-2). Dr. Tope further opined that petitioner exhibited “clear indicators of arousal to that non-consenting element” (tr at 11, lines 7-8).
9. Dr. Tope testified that while confined, petitioner continued to exhibit markers of his underlying interest in the non-consent element, including an incident in 2012 where petitioner “threatened to knock down a female staff member and rape her” and one in 2014, where he “made a comment at St. Lawrence Psychiatric Center about being triggered and that he might touch a female staff member inappropriately” (tr at 13, lines 12-16). Dr. Tope indicated that there were numerous instances wherein petitioner “continued to express that underlying interest” (tr at 13, lines 17-18).
10. Dr. Tope also testified that “as recently as November and December of 2014, at St. Lawrence, [petitioner] threatened to kill a peer that he was angry with, and actually turned over a sock with a — diabetic sugar packets that he was going to use to assault that peer” (tr at 15, lines 9-12).
11. Dr. Tope testified that petitioner’s reporting of his use of cannabis has been inconsistent and she noted that he had been ticketed while in prison for possession. Dr. Tope described petitioner’s use of cannabis to further compound petitioner’s difficulty in controlling his behavior which is already disinhib- *757 ited by his antisocial personality disorder (tr at 15, lines 19-25; at 16, lines 4-8).
12. Dr. Tope explained the three diagnoses together as follows:
“I used the analogy before that the paraphilic disorder is sort of like the green light. It is what drives the bus forward. It is what allows him to approach non-consenting individuals. And the antisocial personality disorder is the absence of a red light. There is no internal stops. There is not the sense of conscious social mores that would stop or prohibit people from stopping or acting on those interests and the cannabis, as I said, would compound that further, disinhibiting the approach behavior towards the paraphilic interests” (tr at 16, lines 17-25 through 17, line 1).
13. Dr. Tope testified that petitioner did not engage in sex offender treatment while serving his sentence of incarceration, nor did he participate in treatment during his confinement at Manhattan Psychiatric Center. Petitioner has had minimal progress in the sex offender treatment program while confined at St. Lawrence Psychiatric Center. Dr. Tope indicated that petitioner had little insight into his mental condition, that he denied that he had any risk factors and further denies that he needs treatment (tr at 18, lines 17-22; at 19, lines 5-23; at 20, lines 1-6).
14. Dr. Tope testified that during petitioner’s confinement at the Manhattan Psychiatric Center, despite being in violation of the rules, petitioner called a sex chat line 10 to 15 times per week (tr at 22, lines 17-23).
15. Dr. Tope reported that during petitioner’s term of incarceration, he was issued a number of disciplinary tickets related to his behaviors. While he has been confined, Dr. Tope testified:
“he continues in more self-sabotaging, antisocial behavior, manipulating situations in order to get his needs met. In Manhattan Psychiatric Center, he was engaging in hunger strikes if he didn’t like particular things. And the notes beginning in the end of September of this year, and based upon my last read of them, he had engaged in that very similar behavior now at St. Lawrence Psychiatric Center” (tr at 23, lines 16-22).
16. Dr. Tope testified that the research suggests that antisocial behaviors often decrease after the age of 40, however, *758 petitioner’s actions indicate that he still continues to engage in such behavior (tr at 26, lines 1-6).
17. Dr. Tope opined that while petitioner has been incarcerated and confined, despite the fact that there are adult women in these facilities, petitioner has not had the same opportunity to re-offend against women, inasmuch as there are always people around and willing to assist the victim (tr at 25, lines 20-23).
18. Dr. Tope also testified that despite petitioner’s medical problems and use of a wheelchair to ambulate, she believed that petitioner would be able to rape again as petitioner has shown that he was able to alight from his wheelchair to pin down a peer at the Manhattan Psychiatric Center in 2014 (tr at 26, lines 7-16).
19. Dr. Tope testified that she relied upon the Violence Risk Scale-Sexual Offender Version, which measures both static and dynamic factors that relate to petitioner’s risk of recidivism, and that petitioner scored a 56, which indicates a high risk (tr at 17, lines 2-25).
20. Based upon her review of petitioner’s records, Dr. Tope opined that petitioner has a mental abnormality and that he is a dangerous sex offender requiring confinement (tr at 27, lines 20-25; at 29, line 1).
21. On cross-examination, when asked if petitioner’s previous sexual offenses were the result of his inability to control himself or if he chose not to control himself, Dr. Tope testified that petitioner “acted without regard to his own personal freedom, safety, or the safety of his victims.” When questioned further, Dr. Tope opined “I would argue, based on all of the offenses, based on the offenses while he was in confinement, that he was unable to control his behavior” (tr at 32, lines 24-25; at 33, line 1; at 34, lines 8-10).
22. Dr. Jeffrey Singer testified as an expert on behalf of petitioner. Dr. Singer opined that he did not believe that petitioner suffers from a mental abnormality as defined by article 10 of the Mental Hygiene Law (tr at 42, lines 4-11).
23. Dr. Singer explained the definition of a mental abnormality to be “a disease or condition that is — you acquire or that is present at birth. It predisposes and affects your emotional, cognitive or volitional capacities in a manner that predisposes the conduct constituting the commission of a sex offense that results in that person having serious difficulty controlling” (tr at 42, lines 14-19).
*759 24. Dr. Singer testified that petitioner did not fit the definition of mental abnormality because petitioner was not “predisposed to commit acts of sexual conduct constituting the commission of [a] sex offense” as “over the past thirty years, [petitioner did not have] difficulty controlling sexual behavior” (tr at 42, lines 20-25).
25. Dr. Singer explained that during the span of 30 years that petitioner was incarcerated and confined, if he was truly predisposed to commit sexual offenses, he would have had difficulty controlling his behavior (tr at 43, lines 10-17). Dr. Singer further explained that if petitioner had an internal need or drive to commit rape, despite his confinement, he would have committed some form of sexual violence or acting out (tr at 44, lines 13-18; at 45, lines 17-20).
26. Dr. Singer testified that he diagnosed petitioner as having antisocial personality disorder and cannabis substance abuse disorder (tr at 48, lines 22-23). He explained that antisocial personality disorder (hereinafter referred to as ASPD) “is a personality structure character, that is hardened to violate the rights and norms of others. It is associated with anger and rule breaking behavior” (tr at 49, lines 1-3).
27. Dr. Singer also described the definition of cannabis substance abuse disorder to be “smoking marijuana, to the degree that impairs your functional ability to fulfill your social obligations” (tr at 49, lines 16-19). However, Dr. Singer denied that either ASPD or cannabis disorder, or a combination of both, would predispose someone to commit a sex offense (tr at 49, lines 20-25).
28. Dr. Singer testified that in 1982, during the time described by counsel as petitioner’s “second wave of crimes,” petitioner had “a serious and substantial problem with raping women” and “it was at the height of his sexual offense sexual cycle peak. Like between 14 and 30 years old for men” (tr at 53, lines 13-16; at 54, lines 1-4). However, as petitioner had not raped a woman in over 30 years and he was now 55 years of age, Dr. Singer denied that there was any indication that petitioner suffered from any form of paraphilia (tr at 53, lines 23-25; at 54, lines 1-2, 5-6).
29. Dr. Singer opined that he did not believe that petitioner was “sexually predisposed to commit acts of sexual violence, given his diagnoses and his history and where he is at now and age” (tr at 55, lines 5-8). Dr. Singer also opined that petitioner does not have a mental abnormality (tr at 55, lines 24-25).
*760 30. On cross-examination, Dr. Singer read from his notes taken during a 50-minute interview with petitioner that petitioner told him, “I have got to get high in relation to my crimes — I have gotten high in relation to my crimes” (tr at 61, lines 20-22).
31. Dr. Singer testified that during his interview with petitioner, he did not ask petitioner about masturbation, his fantasies, urges or thoughts. Dr. Singer did not believe that petitioner would answer him honestly and he did not think such information would be predictive of behavior (tr at 61, lines 23-25; at 62, lines 1-4; at 63, lines 1-4, 22-25; at 64, lines 1-3).
32. Dr. Singer testified that he did not question petitioner about fantasies of bestiality, voyeurism or exhibitionism despite instances of all those acts in petitioner’s history (tr at 66, lines 6-25). Dr. Singer also testified that he did not question petitioner about taking trophies and momentos from rape victims (tr at 67, lines 9-15).
33. Dr. Singer testified that he did not find any clinical significance in the fact that petitioner had kidnapped at least two of the victims with the intention of raping them. He opined that these were “power-based rapes and acts of sexual violence that were not paraphilically-driven” (tr at 68, lines 2-3). Dr. Singer did not attach any importance to the facts that petitioner “engaged in fondling the breasts, digitally penetrating the vagina in an effort to gain an erection for his own sexual pleasure and then not once, but repeatedly engaging in vaginal sex with the victim” (tr at 68, lines 4-17).
34. Dr. Singer did not ask petitioner during the 50-minute interview whether petitioner had “forced sex upon a male, [or] coerced male sex,” which petitioner had previously disclosed (tr at 69, lines 1-10).
35. On redirect, Dr. Singer testified as follows:
“(Bliss) Q: What is a power-based rape?
“A: Well, most rapes are committed by men who want to dominate, obliterate, violate women. And it is not an act of sexual gratification. It is an act of violence.
“Q: In power-based rapes, are — if you can comment on it — is the offender able to maintain an erection?
“A: Well, I think most of the time, yes.
“Q: How does the distinction of power-based rape versus paraphilic rape make any difference to you?
*761 “A: A big difference. A paraphilic-based rape suggests that the person’s sexual drive is primarily made up of the act of rape as their main way to get sexual gratification.
“Court: So, there is a paraphilic rape?
“A: Only in theory. They haven’t been able to really demonstrate it as something cohesive that hangs together, or, we would have the diagnosis. In theory, it exists” (tr at 80, lines 19-25 through 81, lines 1-10).
36. On re-cross-examination, Dr. Singer indicated that petitioner’s threats of rape were merely acts of verbal aggression and Dr. Singer excused same as “talk is cheap” (tr at 85, lines 8-18).
Conclusions of Law
Preliminarily, both experts opined that petitioner can be diagnosed as having both antisocial personality disorder and cannabis use disorder. The State’s expert, Dr. Tope, further opined that petitioner may also be diagnosed with other specified paraphilic disorder, non-consent. Petitioner’s expert, Dr. Singer, denied that such qualifier exists and further denied that petitioner can be diagnosed with any paraphilia disorder in light of the amount of time that has passed since his last offense.
In Matter of State of New York v Shannon S. (20 NY3d 99 [2012]), the Court of Appeals considered a similar issue relating to a diagnosis of paraphilia not otherwise specified (paraphilia NOS)[3] as that term is defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) and particularly the qualifier of hebephilia, which is the sexual attraction to fully formed pubescent women. In a 4-3 decision, the Court of Appeals upheld the lower court’s determination that the respondent in that case had a mental abnormality as defined by Mental Hygiene Law § 10.06 (k). The Shannon S. opinion rejected the premise that in order to find a sex offender to have a mental abnormality, a diagnosis must completely conform to a textbook definition.
“The United States Supreme Court has previously remarked that ‘the States have, over the years, *762 developed numerous specialized terms to define mental health concepts,’ and in the context of civil confinement of dangerous sexual offenders, state legislatures have been granted the latitude to utilize phraseology that, while informed by prevailing medical knowledge, is intended to have greater legal, and not medical, significance. Thus, in the civil confinement arena, there will undoubtedly be an ‘imperfect fit between the questions of ultimate concern to the law and the information contained in [the DSM’s] clinical diagnosis.’ In New York, the plain language of Mental Hygiene Law § 10.03 (i), in defining a mental abnormality, like the analogue statutes of several states, does not reference or require that a diagnosis be limited to mental disorders enumerated within the DSM. Therefore, contrary to respondent’s argument, a mental abnormality ‘need not necessarily be one so identified in the DSM in order to meet the statutory requirement’ ” {id. at 106 [citations omitted]).
The Shannon S. opinion noted that the diagnosis of para-philia NOS had not yet been subjected to a Frye hearing. However, in light of the record, including the testimony of two experts who “identified respondent’s lack of compunction and incapability to comprehend the inappropriateness of his conduct,” the Court found that the respondent did indeed suffer from a mental abnormality “ ‘involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility’ ” (id. at 108, quoting Mental Hygiene Law § 10.03 [e]).
Two years later, the Court of Appeals issued its decision in Matter of State of New York v Donald DD. (24 NY3d 174 [2014]). As distinguished from its holding in Shannon S., the Court of Appeals held that Donald DD.’s diagnosis of ASPD, by itself, was insufficient to establish a “condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct” {id. at 190-191 [emphasis omitted], quoting *763 Mental Hygiene Law § 10.03 [i]).[4] In so ruling, the Court stated that
“[a] diagnosis of ASPD alone — that is, when the ASPD diagnosis is not accompanied by a diagnosis of any other condition, disease or disorder alleged to constitute a mental abnormality — simply does not distinguish the sex offender whose mental abnormality subjects him to civil commitment from the typical recidivist convicted in an ordinary criminal case. ASPD ‘means little more than a deep-seated tendency to commit crimes.’ Its use in civil confinement proceedings, as the single diagnosis underlying a finding of mental abnormality as defined by Mental Hygiene Law article 10, proves no sexual abnormality” (id. at 190 [citation omitted]).
The Court concluded that “an ASPD diagnosis has so little relevance to the controlling legal criteria of Mental Hygiene Law § 10.03 (i) that it cannot be relied upon to show mental abnormality for article 10 purposes” (id.). In clarifying, the Court found that ASPD is not “in itself an unreliable diagnosis”; rather, it found that “[t]he problem is that ASPD establishes only a general tendency toward criminality, and has no necessary relationship to a difficulty in controlling one’s sexual behavior” (id. at 191 [emphasis added]). As such, the Donald DD. opinion created a requirement that ASPD must be accompanied by something more substantial to prove the propensity to sexually re-offend.
In the matter at bar, the State’s expert has diagnosed petitioner as suffering from other specified paraphilic disorder, non-consent, a diagnosis which, of necessity, includes a propensity to sexually re-offend. Counsel concedes that the diagnosis of other specified paraphilic disorder, standing alone, *764 has been recognized as an acceptable diagnosis. However, there has been some disagreement as to whether further specifying the type of paraphilia into categories such as “non-consent” has been generally accepted and thus whether such a diagnosis is sufficient in applying Mental Hygiene Law § 10.09. This court takes judicial notice of the two published decisions following Frye hearings regarding the acceptance of non-consent as a qualifier of other specified paraphilic disorder: Matter of State of New York v Jason C. (51 Misc 3d 553 [Sup Ct, Kings County 2016]) and Matter of State of New York v Kareem M. (51 Misc 3d 1205[A], 2016 NY Slip Op 50427[U] [Sup Ct, NY County 2016]). Both trial courts found that “non-consent” has not been generally accepted as a qualifier in the relevant psychiatric community, there being no common criteria for such a diagnosis. Both decisions indicate that, over the years, the professional psychiatric community has systematically rejected inclusion of “non-consent” as a qualifier in the various drafts of the DSM because there are too many variables for diagnosis. Both decisions also note the “politics” of including non-consent as a paraphilia, including a concern that doing so would diminish the criminality of rape because offenders could use the qualification as a mental health defense.
The court also notes one decision issued after a Frye hearing regarding the admissibility of the DSM-5 diagnosis of unspecified paraphilic disorder, which held that such a diagnosis is generally accepted (Matter of State of New York v Harris, 48 Misc 3d 950 [Sup Ct, Bronx County 2015]). The Harris court found that the experts in that case agreed that
“in order for a diagnosis to be included in the Manual, there must be sufficient literature generated about that diagnosis to meet general acceptance in the relevant scientific community. Accordingly, the deliberate and careful decision to replace paraphilia NOS with unspecified paraphilic disorder is illustrative of its acceptance as a reliable diagnosis within the psychiatric and psychological community, and supports its legitimacy as a valid diagnosis” {id. at 962-963).
The Harris court considered the testimony of Dr. David Thornton, who served as an expert advisor on paraphilia sub-work groups and was involved in setting up field trials on various paraphilic disorders for purposes of providing information to the editors of the DSM-5. Dr. Thornton testified that the previously defined paraphilia NOS had been divided into two *765 subgroups: other specified paraphilia and unspecified para-philia. He further testified that the “other specified” diagnosis would relate to a person with a paraphilia other than the eight specifically listed paraphilias (i.e., necrophilia, zoophilia, etc.) and the “unspecified” paraphilia would be applied “in instances where a person is determined to satisfy the general criteria for a paraphilic disorder but insufficient information exists for a specific diagnosis” (id. at 952-953). From this description, the diagnosis of “unspecified paraphilia” is akin to a lesser included diagnosis of “other specified paraphilia.” Unspecified paraphilia denotes that a person exhibits the symptomology of paraphilia, while other specified paraphilia is utilized when the evaluator wants to specify the cause of the paraphilia. If the “unspecified paraphilia” diagnosis, with its less exacting criteria, was recognized after Frye analysis in the Harris case, then even if the “non-consent” qualifier has not yet been deemed acceptable in the relevant medical community, it is apparent to this court that petitioner still suffers from paraphilia.
The majority opinion in Shannon S. and the dissenting opinion in Donald DD.[5] are instructive. “[I]n the civil confinement arena, there will undoubtedly be an ‘imperfect fit between the questions of ultimate concern to the law and the information contained in [the DSM’s] clinical diagnosis’ ” (Matter of Shannon S. at 106, citing Clark v Arizona, 548 US 735, 775 [2006]). If the qualifier of non-consent cannot be considered, *766 per se, then this court will consider the factors relied upon by Dr. Tope in making her diagnosis; that is, Dr. Tope’s description of the contours of petitioner’s individual paraphilic disorder. The factors underpinning Dr. Tope’s diagnosis are manifold: (1) petitioner’s numerous offenses over a short period of time within a few weeks of his release from incarceration, (2) petitioner’s similar modus operandi in isolating his victims in the same area and using a weapon to threaten, (3) petitioner’s continued threats against fellow patients and staff at the psychiatric center, (4) petitioner’s admission to coercing sex from a fellow patient, (5) petitioner’s use of a sex chat line while confined, and (6) petitioner’s use of cannabis during the underlying offenses and his provision of medication to his fellow patients while confined. Dr. Tope noted that while petitioner has been incarcerated and confined, he has been unable to control his behavior (which is attributable to ASPD), but he has not had the opportunity to prey upon his chosen targets (non-consenting women in the community). Dr. Tope stressed, however, that this should not be confused with a diminished likelihood of re-offending.
Such an analysis is consistent with the holding of the Appellate Division, Third Department, in Matter of State of New York v Richard TT. (132 AD3d 72 [3d Dept 2015]). In that case, the Court focused on the individual respondent and his “detailed psychological portrait.” (Id. at 78.) That portrait included a diagnosis of various disorders which, on their face, did not necessarily demonstrate a likelihood that the respondent would commit a sex offense (antisocial personality disorder, borderline personality disorder and cannabis abuse). However, since the respondent demonstrated poor sexual impulse control arising from these otherwise general disorders, the court held that the statutory definition of mental abnormality had been met (id.). Here, as in Richard T.T., petitioner’s portrait “shows an individual whose various disorders create a toxic mix that have not only caused him to objectify women and feel ‘entitled to sex regardless of impact,’ but have also impelled him to satisfy those desires” (id.).
Unlike Donald DD., this case involves much more than just a general propensity to re-offend. Petitioner here harbors a specific propensity to commit sex offenses due to a mental abnormality. His individually held and continuing propensity to commit violent rape is precisely the type of conduct against which the statute was intended as protection for the public. *767 Petitioner has a criminal history that began nearly 40 years ago and has repeatedly put his needs or wants above those around him, despite the harm caused to others. On this record, Dr. Tope’s diagnosis of other specified paraphilic disorder, non-consent, is sufficient. Based upon petitioner’s criminal history, together with his failure to meaningfully engage in sex offender treatment and his lack of impulse control (as diagnosed by both experts presented), petitioner clearly fulfills the definition of dangerous sex offender requiring confinement.[6] Notwithstanding whether “non-consent” as a qualifier has been accepted for publication in the DSM-5, to hold otherwise would be to eviscerate both the purpose and the text of the statute. While noting the holdings in the Jason C. and Kareem M. cases, this court declines to follow them.
This court has considered the testimony of Dr. Singer with some skepticism inasmuch as Dr. Singer did not utilize his 50-minute interview of petitioner to inquire into petitioner’s current thoughts, urges or desires. While Dr. Singer opined that the underlying criminal acts committed by petitioner in 1982 were too remote to be considered, he also avoided asking pertinent questions of petitioner regarding his current thoughts and urges. As such, the professional opinion of Dr. Tope was given considerably more weight than that of Dr. Singer.
Based upon the foregoing, the court finds that petitioner continues to have a mental abnormality as defined by Mental Hygiene Law § 10.03 (e) and such abnormality predisposes petitioner to commit sex offenses, and such an inability to control behavior, that petitioner is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.
Given the unusual procedural delay in this case, however, petitioner may make his next application under Mental Hygiene Law § 10.09 after the passage of one year from the date of the evidentiary hearing in this matter (Oct. 19, 2015), *768 rather than the date of this decision and order, as would normally be the case under Mental Hygiene Law § 10.09 (b).

. Petitioner was found to have a mental abnormality following a jury trial. Supreme Court, Richmond County (Collini, J.), conducted a further hearing regarding disposition pursuant to Mental Hygiene Law § 10.07 (f). It is noted that the State’s expert, Dr. Rackley, diagnosed petitioner with paraphilia with personality disorder and substance abuse disorder.

. While the Frye hearings had been either held or scheduled at the time of the evidentiary hearing in this case, written determinations had not yet been issued.

. The court notes that the DSM-IV diagnosis of paraphilia NOS has been changed in the DSM-5 to be two separate designations: other specified paraphilic disorder (with a qualifier) and unspecified paraphilic disorder.

. This court notes that Matter of State of New York v Donald DD. includes an appeal captioned Matter of State of New York v Kenneth T. There was evidence that Kenneth T. suffered hot only from ASPD, but also from paraphilia NOS. Again, the diagnosis of paraphilia NOS was not subjected to a Frye hearing, so the Court of Appeals did not rule on the general acceptance of the diagnosis in the relevant psychiatric community. However, the Court reversed the lower courts, dismissing the State’s petition based upon a finding that the State’s expert improperly relied upon the fact that Kenneth T. failed to make efforts to avoid arrest and re-incarceration. The Court held that much more was necessary, but declined to elaborate on just what “more” might be, other than a recognized sexually-related diagnosis- — a requirement which would appear to contravene its holding in Shannon S.

. “In conflating the predicate disorder with the mental abnormality, the majority implicitly injects a requirement that the underlying disorder be ‘sexually-related’ into Mental Hygiene Law § 10.03 (i) on the mistaken premise that such a requirement is necessary to distinguish an offender subject to civil management from a ‘typical recidivist convicted in an ordinary criminal case’ (majority op at 189). Neither the plain language of the statute nor due process compels this conclusion (see Mental Hygiene Law § 10.03 [i]; see generally Crane, 534 US at 411-414; Hendricks, 521 US at 357-360). Instead, it is the effect of the condition — sexually-related or not — on the offender’s capacities and ability to control sexual impulses that is key. Where a disorder predisposes a person to sex offending by impacting the individual’s cognitive, volitional, or emotional capacities, it is the interplay of these factors and the concomitant impulse control problems — not the inherently sexual nature of the predicate disorder — that distinguishes an offender subject to management from a ‘dangerous but typical recidivist’ (Crane, 534 US at 413). Whether a disorder such as ASPD has the necessary effect on the offender to support a mental abnormality finding must therefore be determined on a case-by-case basis” (Matter of Donald DD. at 196-197 [Graffeo, J., dissenting]).

. Pursuant to Mental Hygiene Law § 10.03 (e),
“[d]angerous sex offender requiring confinement means a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.” (Internal quotation marks omitted.)